UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE GUY MITCHELL & BETTY J. MITCHELL FAMILY TRUST, by and through JOSEPH S. STANZAK, as Trustee,[1]<br><br>                Plaintiffs,<br><br>    v.<br><br>ARTISTS RIGHTS ENFORCEMENT CORPORATION, a New York Corporation,<br><br>                Defendant. | NO:  11-CV-0024-TOR<br><br>FINDINGS OF FACTS AND CONCLUSIONS OF LAW AFTER BENCH TRIAL |

THIS MATTER was tried to the Court on October 28-29, 2013.  Plaintiff is represented by O. Yale Lewis, Jr.  Defendant was represented at trial by Daryl M.

---

[1] Pursuant to F.R.Civ.P. 15 and 17, the Court hereby conforms the pleadings to the evidence, having completed a bench trial which was prosecuted by Joseph S. Stanzak, the trustee for The Guy Mitchell & Betty J. Mitchell Family Trust.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 1

Crone and Steven A. Brown.  The Court has considered the testimony and evidence received and the parties' post-trial briefing and is fully informed.

## BACKGROUND

This action arises from a contract dispute regarding the distribution of royalty payments.  Plaintiff, the Guy Mitchell and Betty J. Mitchell Family Trust ("Trust") seeks injunctive relief, declaratory judgment, and damages for alleged breach of fiduciary duty, conversion, "accounting," and breach of contract.  ECF No. 210 at 1.  Specifically, Plaintiff seeks:

1. A declaratory judgment that AREC is not entitled to any portion of either (a) the accrued royalties owed to the Trust by Sony under the Mitchell Recording Contract that Sony is currently withholding; or (b) any future royalties owed by Sony to the Trust under the Mitchell Recording Contract;

2. An injunction ordering AREC to join with the Trust in a written direction to Sony that:
     a. The accrued funds Sony is currently withholding should be paid directly to the Trust;
     b. All future royalty payments and the associated royalty statements should be paid directly to the Trust;

3. A judgment against AREC for conversion of $3,989.99 belonging to the Trust; and an order requiring AREC to immediately convey that sum to the Trust;

4. An award of $3,989.99 in damages for breach of contract and breach of fiduciary duty plus and award of reasonable attorney fees and costs for the breach of fiduciary duty;

5. An award of reasonable attorney fees and costs;

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 2

6. Interest on the damages incurred from the date incurred at the rate of twelve percent (12%) per annum;

7. Denial of all of Defendant's counterclaims; and

8. Such other and further relief as the Court deems just and equitable.

ECF No. 210 at 35-36.

Defendant, Artists Rights Enforcement Corporation ("AREC"), counterclaimed for injunctive relief, declaratory judgment, and damages for alleged breach of contract. ECF No. 210 at 1. AREC seeks an award of damages in the amount of $48,072.05, plus prejudgment interest, and a declaration of rights as follows:

1. The 2005 Agreement remains in force.

2. AREC was entitled to payment of 50% of the Sony settlement payment, i.e., $60,000. AREC is entitled to an award of the $40,000 it deferred in connection with the Sony settlement, from 100% of the royalties payable to the Trust.

3. In addition, AREC is entitled to 25% of all sums received by the Trust from any source, up to $6,000 in a given year, and 50% of all sums received from any source beyond $6,000 in a given year.

4. Sony and any successor shall report and account directly to AREC, which shall continue to administer the recovery of royalties, and pay the Trust whatever balance remains after deduction of AREC's fee.

ECF No. 210 at 36-37.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  *See* ECF No. 193.  Venue is proper in this District under 28 U.S.C. § 1391(a) and (c).

FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A. Conflict of Laws**

The parties' agreement does not include a choice-of-law provision.  AREC argues that New York law should apply, while the Trust contends that Washington law governs.  Federal courts sitting in diversity "must look to the forum state's choice of law rules to determine the controlling substantive law."  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002).  Under Washington law, deciding applicable state law is a two-part inquiry.  "Before a court will conduct a conflict-of-law analysis, the party seeking to apply foreign law must show that an actual conflict exists between the presumptive Washington law and the law of the foreign state." *Alaska Nat. Ins. Co. v. Bryan*, 125 Wash. App. 24, 30 (Ct. App. 2004); *see also Burnside v. Simpson Paper Co.*, 123 Wash.2d 93, 100 (1994).  If the state's laws do not conflict, presumptive local law is applied.  *Seizer v. Sessions*, 132 Wash.2d 642, 648-49 (1997).  Conversely, if there is an actual conflict, the applicable law is determined by which state has the "most significant relationship" to the specific issue.  *Williams v. State*, 76 Wash.App. 237, 241 (1994).

Here AREC fails to uphold its burden, as the party seeking to apply foreign law, to show that an actual conflict exists between New York and Washington law.

1    Accordingly, the Court will continue to apply Washington law as it has previously.

2    ECF No. 152.

3    **B. Contract Interpretation, Construction and Parole Evidence**

4        "The touchstone of contract interpretation is the parties' intent." *Tanner*

5    *Elec. Coop. v. Puget Sound Power & Light Co*., 128 Wash.2d 656, 674, 911 P.2d

6    1301 (1996).  Washington courts follow the "objective manifestation" theory of

7    contracts. *Hearst Commc'ns, Inc. v. Seattle Times Co*., 154 Wash.2d 493, 503, 115

8    P.3d 262 (2005).  A valid contract requires an objective manifestation of mutual

9    assent to its terms, rather than any unexpressed subjective intent of the parties. *Id*.

10   at 503.  Courts will not impose obligations that the parties did not assume for

11   themselves.  *Condon v. Condon*, 177 Wash.2d 150, 162–63, 298 P.3d 86 (2013).

12   A formation of a contract requires that there be an objective manifestation of

13   mutual assent of both parties.  *P.E. Sys., LLC v. CPI Corp*., 176 Wash.2d 198, 207,

14   289 P.3d 638 (2012).  Intent may be imputed based on the ordinary meaning of the

15   words within the contract. *Hearst*, 154 Wash.2d at 503.  Words in a contract are

16   given their ordinary, usual, and popular meaning unless the entirety of the

17   agreement clearly demonstrates a contrary intent. *Hearst*, 154 Wash.2d at 504

18   (*citing Universal/Land Constr. Co. v. City of Spokane*, 49 Wash.App. 634, 637,

19   745 P.3d 53 (1987)).  Extrinsic evidence may also be used to determine the parties'

20   intent.  *Berg v. Hudesman*, 115 Wash.2d 657, 667, 801 P.2d 222 (1990).

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 5

1    We do not interpret what was intended to be written but what was written.

2    *Hearst*, 154 Wash.2d at 504.  Thus, if the contract's language is clear and

3    unambiguous, then we must enforce the contract as written. *Allstate Ins. Co. v.*

4    *Peasley*, 131 Wash.2d 420, 424, 932 P.2d 1244 (1997).  Extrinsic evidence offered

5    to contradict the terms of an unambiguous contract is inadmissible. *Hollis v.*

6    *Garwall, Inc*., 137 Wash.2d 683, 695, 974 P.2d 836 (1999).

7    **C. Breach of Contract**

8    A contract is actionable when it imposes a duty, that duty is breached, and

9    the breach proximately causes damage to the one owed the duty. *NW Indep. Forest*

10   *Mfrs. v. Dep't of Labor & Indus.*, 78 Wash.App. 707, 712 (1995).  Failure to

11   perform a contractual duty constitutes a breach. Whether a party has materially

12   breached a contract is generally a question of fact. *Bailie Communications, Ltd. v.*

13   *Trend Bus. Sys.*, 53 Wash.App 77, 82 (1988).  We test the materiality of a breach

14   by considering (1) whether the breach deprives the injured party of a benefit he or

15   she reasonably expected, (2) whether the injured party can be adequately

16   compensated for the benefit he or she lost, (3) whether the breaching party will

17   suffer a forfeiture by the injured party's withholding of performance, (4) whether

18   the breaching party is likely to cure his breach, and (5) whether the breach

19   comports with good faith and fair dealing.  *Bailie Communications*, 53 Wash.App

20   at 83 (citing Restatement (Second) of Contracts sec. 241(a)-(e) (1981)). A material

breach is one serious enough to justify the other party's abandoning the contract because the contract's purpose is defeated. *Park Ave. Condo. Owner's Ass'n v. Buchan Devs.,L.L.C., 117 Wash. App. 369, 383 (2003).* If a breach is material, the aggrieved party may cancel the contract. *Jacks v. Blazer*, 39 Wash.2d 277, 285 (1951).

Washington courts allow prejudgment interest only when a claim is liquidated. A liquidated claim is one "where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Hoglund v. Meeks*, 139 Wash.App. 854, 878 (2007). In *Schrom v. Bd. For Volunteer Fire Fighters*, 153 Wash.2d 19, 36 (2004), the Supreme Court held that RCW § 19.52.010 mandates 12 percent prejudgment interest when the parties have not agreed on some other rate. The term "per annum" appearing in this statute refers to a year of 365 days (not 360 days). *O'Brien v. Shearson Hayden Stone, Inc.*, 90 Wash.2d 680, 692 (1978).

The Court makes the following findings of facts gathered from the agreed facts contained in the Pretrial Order (ECF No. 210 at 2-6) and from the testimony and exhibits presented at the bench trial. Guy Mitchell was a successful musician in the 1950s who released at least nine records that have sold more than one million copies each. After a successful career, Guy Mitchell retired in the late 1960s and assigned to the Trust his rights under various recording contracts,

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 7

including his rights to collect royalties from Sony Music Entertainment ("Sony").

Mr. and Mrs. Mitchell were the Trust's sole beneficiaries and both were co-

Trustees of the Trust until Guy Mitchell died in 1999, at which time Mrs. Mitchell

became the sole beneficiary and the sole Trustee of the Trust.  In or about

November 2001, Mr. Joseph Stanzak ("Stanzak"), Mrs. Mitchell's son and Guy

Mitchell's stepson, was named a co-trustee of the Trust.  Mrs. Mitchell was a co-

trustee with her son Joseph Stanzak until her death in November 2010, at which

time Mr. Stanzak became sole trustee.

      For decades, Sony and its predecessor-in-interest paid regular semi-annual

royalties to Guy Mitchell or to the Trust.  Payments were generally made in the

month of August for the royalties accrued in the first six months of that year, and

generally in the month of February for royalties accrued in the last six months of

the previous year.  The Trust received royalties from Sony on this semi-annual

basis, totaling many thousands of dollars each year.  ECF No. 210 at 3.  In 2005,

royalties for the period ending June 30, 2005 were merely \$6,724.29; and for the

period ending December 31, 2005 were only \$855.64.

      The firm Webman & Associates ("Webman") was hired to periodically

perform audits of Sony's books and records for discrepancies, errors, and

underreporting of Mr. Mitchell's royalty payments.  Webman contracted to receive

thirty percent (30%) of any additional payments it recovered over and above the

regular semi-annual income the Trust already received from Sony.  In 2004,

Webman negotiated a settlement of an audit of Sony whereby the Trust would

receive a lump sum payment covering the years 2000-2004 in the amount of

$69,979.69, less Webman's 30% fee ($20,993.91).  Concerned whether Webman

was fully representing the Trust's best interests, the Trust did not enter into the

settlement with Sony, but rather hired AREC in June 2005.

On June 13, 2005, Mrs. Mitchell, on behalf of the Trust, and Chuck Rubin

("Mr. Rubin"), President of AREC, signed an agreement ("Agreement") for AREC

to act on behalf of the Trust in investigating and recovering royalties due to the

Trust from Sony.  Exhibit 1.  The Agreement specifically provided

> [i]t is my understanding that you are to use your best efforts to obtain from
> music companies and all others who are or may be liable to THE FAMILY
> TRUST, as well as any other persons or entities acting in concert with them,
> an accounting for and collection of such royalties and other rights which are
> or may be due from the manufacture, sale, copyright, publication, use,
> commercial exploitation or distribution of phonograph records, CD's (sic),
> tapes, videos, devises or any other use of GUY MITCHELL's artistic
> material and/or performances.

Exhibit 1.  The Agreement indicated that AREC would engage counsel and initiate

litigation on behalf of the Trust.  The Agreement also provided in relevant part that

> [i]n return for your services rendered hereunder, you shall be initially
> entitled to an on-going twenty-five (25%) percent of all sums and assets
> which are received from Sony BMG Music Entertainment (successor-in-
> interest to Columbia Records, CBS Records and Sony Music) beginning
> with any special payments made after June 30, 2005 and specifically with
> the period ending December 31, 2005.  However, in return for your services

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 9

rendered hereunder and as a proximate result of your activities pursuant to this agreement, if you are successful through either negotiation or litigation in generating income that is in excess of the amount THE FAMILY TRUST would have received but for your involvement, you shall then be entitled to an on-going fifty (50%) percent of such sums and assets.  I further agree that all out-of-pocket expenses (including fees to additional local counsel) incurred by you in connection with the handling of THE FAMILY TRUST's claim(s) shall be reimbursed and deducted "off the top" from the amounts recovered before the division of our respective shares.

Exhibit 1.  AREC recommended an attorney who the Trust retained to represent the Trust, and a lawsuit against Sony and Webman was filed in New York in 2005. That lawsuit was ultimately settled, with Sony paying the Trust $120,000 in April 2009, of which $20,000 was retained by AREC (and split with the attorney for the Trust).  The settlement covered all years through June 30, 2008.  Exhibit 521. Nothing was paid to Webman for its services.

In the June 2005 Agreement, the Trust also authorized AREC to collect and receive all royalties on behalf of the Trust.  As indicated above, the semi-annual royalty payment from Sony for the six-month period ending December 31, 2005, was $855.64.  For 2006 through 2008, the payments annually totaled $4,536.86; $2,688.69 and $8,135.90, respectively.  AREC took no portion of the royalty payments for the six-month periods ending December 31, 2005 through June 30, 2008.

In February 2009, AREC received Sony's royalty payment for the semi-annual period ending December 31, 2008, in the amount of $3,918.60, of which

AREC took 25 percent and issued a check to the Trust for the remainder, which was $2,938.95.  In August 2009, AREC received Sony's royalty payment for the semi-annual period ending June 30, 2009, in the amount of $6,020.67, of which AREC took 50 percent and issued a check to the Trust for the remainder, which was $3,010.34.  In March 2010, AREC issued a check for $357.40 for the Sony royalties for the period ending December 31, 2009, along with the royalty statement from Sony; AREC's transmittal letter stated that it did not deduct any portion of the royalties for that period.  Shortly thereafter, Mr. Stanzak terminated the Trust's prior directive to Sony and directed Sony to transmit future royalty payments and related royalty statements directly to the Trust.

Semi-annual Sony royalties for 2010 were $16,114.11, which were paid directly to the Trust.  For the semi-annual periods ending June 30, 2011, through the semi-annual period ending June 30, 2013, Sony has advised the Trust's counsel that Sony has accrued $9,526 in royalties owing to the Trust, which have been withheld by Sony (pending this litigation).

The Trust contends AREC breached the agreement when it (a) failed to conduct an accounting of Sony and (b) when it took 25 percent of the regular royalties for the period ending December 31, 2008, and 50 percent of the regular royalties for the period ending June 30, 2009.  ECF No. 206 at 7.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 11

1        The Court finds the Agreement was for AREC to use its best efforts to

2   obtain an "accounting for and collection of" royalties from Sony.  After

3   considering the context of the contract formation, this specific wording did not

4   contemplate that AREC would force an accounting from Sony, as that term is used

5   in the law.  An accounting in the law would most assuredly have required AREC to

6   engage counsel to begin the lengthy process of seeking a court-ordered accounting

7   from Sony.  Such legal term of art was not the objective manifestations of the

8   parties, but rather the terms "accounting for" contemplated that AREC would

9   obtain a line-by-line analysis of each of Sony's royalty reports, compare those to

10  Guy Mitchell's products available for sale in the marketplace, and determine

11  whether the correct amount of royalties were being paid by Sony.  Nor does the

12  Court find that the contract required AREC to perform an audit, as that term is

13  used in the accounting industry.  First, the word "audit" does not appear in the

14  contract.  Second, an audit would be prohibitively expensive given the realistic

15  number of Guy Mitchell's products actually in the market.  Finally, the Court

16  credits the testimony of Gabin Rubin[2] and Mr. Rubin that the contemplated and

17  agreed-upon method for "accounting for and collecting" royalties was to research

18  _____

19  [2] Gabin Rubin is the Vice President and General Counsel of AREC.  She is also

20  Chuck Rubin's daughter.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 12

the market and compare those products to the royalty reports Sony was producing. *See e.g*., Exhibit 514 and 520.  Further, the Court credits Mr. Rubin's testimony that he knew where to look and what to ask for from Sony in order to capture royalties that were not properly documented in Sony's records.  Based on his familiarity with Sony, he knew the questions to ask and understood the places to look for otherwise unreported royalties.  The Court further credits Mr. Rubin's unrebutted testimony that he successfully convinced Sony to implement the correct royalty rates and modify their accounting records appropriately.  The Court rejects the Trust's suggestion that AREC should have only implemented the rates that increased royalties, not the ones that decreased royalties.[3] The correct royalty rate is what is required, and according to Mr. Rubin, this was done.  The Court credits the unrebutted testimony of Gabin Rubin and Mr. Rubin that these accounting and collection procedures required by the 2005 Agreement were accomplished.[4] Accordingly, the Court finds that AREC did not breach the Agreement by failing to conduct any additional "accounting of Sony."

---

[3]  The Court also rejects the suggestion that the 2005 Agreement required AREC to renegotiate the terms of Guy Mitchell's royalty rates with Sony.

[4] Mr. Rubin testified and the Court accepts that Sony's spreadsheets and royalty statements were regularly provided to the Trust.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 13

1    Next, the Trust contends AREC breached the Agreement when it took 25

2  percent of the regular royalties for the period ending December 31, 2008, and 50

3  percent of the regular royalties for the period ending June 30, 2009.

4    With respect to the period ending December 31, 2008, the Court finds there

5  was no breach of the Agreement.  After hearing the testimony of the witnesses,

6  considering the context of the formation of the Agreement, and reviewing the

7  Agreement itself, the Court is convinced the Agreement means exactly what it

8  says, it recites the objective manifestation of the parties.  Under the Agreement,

9  AREC is entitled to 25% of Guy Mitchell's royalties received from Sony.  The

10  word "initially" is used to demarcate that the first fee AREC is entitled to under the

11  agreement is the 25% fee.  A second fee is described in the same paragraph set off

12  by the use of the word "However."  In other words, the Agreement and the mutual

13  objective manifestations of the parties were that AREC would receive 25% of the

14  royalties collected, but if AREC generated income in excess of what the Trust

15  would have normally received, AREC would receive a 50% fee from that

16  additional income.  No evidence received by the Court credibly detracts from this

17  plain reading of the Agreement.

18    The Court rejects the Trust's argument that this fee would be unconscionable

19  or that there is no way that such a fee would have been agreed upon.  AREC

20  offered its services to account for and collect the royalties on a continuous basis.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 14

1   This agreement is unlike the Trust's prior arrangement with Webman where every

2   so often it agreed to pay Webman 30% of any additional royalties collected.  These

3   are merely two ways of fundamentally accomplishing the same thing.  Based on

4   Mr. Rubin's confident and positive attitude that he could increase collections, the

5   Court finds that the Trust agreed to this new method of collecting royalties at a flat

6   rate coupled with an incentive rate.

7        For the period ending June 30, 2009, the analysis is much more complicated.

8   As referenced above, the Agreement contemplates a second tier of fee collection

9   based on income "in excess of the amount THE FAMILY TRUST would have

10  received but for your involvement . . ."  The Agreement clearly does not document

11  that this number was established by the parties either expressly or by incorporation

12  of some other objective formula. The Court finds that while the parties each have

13  variously claimed during this proceeding that this floor or base figure was agreed

14  upon, it is clear from the testimony and evidence received that this number was

15  never agreed upon.  In context, the Court credits the testimony of Mr. Stanzak that

16  the parties optimistically hoped that AREC involvement would cause Sony to

17  disgorge large sums of otherwise withheld royalties ("50% of a million is a lot

18  better than 30% (Webman's rate) of [a pittance]").  In any event, the operative

19  number was never agreed upon by the parties.  Mr. Rubin eventually admitted

20  during his testimony in response to questions about when the claimed $6,000 base

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 15

royalty floor agreement was reached, "It didn't happen." Both parties have invited this Court to supply the missing number, contending that it is subject to calculation. Neither party performs that calculation however. In any event, this Court does not have the privilege of supplying a missing material term to a contract for which the parties have not mutually assented. Accordingly, no agreement was reached as to when the 50% fee rate would apply.[5] Without this term, only the initial fee remains applicable, the flat 25% rate.

Accordingly, AREC was not entitled to deduct a 50% fee from the royalties for the period ending June 30, 2009, based on this contract provision. However, AREC does not claim a 50% fee for this period, but rather contends that it retained a 50% fee to recoup deferred fees from prior periods. According to the Agreement, AREC was supposed to start receiving its fees beginning with the period ending December 31, 2005. Exhibit 1. Mr. Rubin testified that he agreed

---

[5] The Trust introduced three recorded telephone calls between Mr. Stanzak and Mr. Rubin to support its version of the events; February 2008, November 2009, and January 2011. These recordings do not shed any light upon the objective manifestation of the parties at the time the 2005 Agreement was signed. They do verify the Court's finding that the parties never agreed upon the amount at which the 50% rate would begin to apply.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 16

not to collect AREC's 25% fee from this period through June of 2008 after Mr.

Stanzak explained that his mother was in ill health and needed the money.  He

testified these were advances made to Mrs. Mitchell.  Mr. Rubin admitted that he

did not otherwise document that he was making advances or that he was going to

collect on those advances from future royalty payments.  To be clear, Mr. Rubin

never testified that he obtained the agreement of Mr. Stanzak or Mrs. Mitchell that

these were advances or deferments.

Indeed the record supports the opposite conclusion.  On February 21, 2006,

AREC wrote to Mrs. Mitchell and Mr. Stanzak that only $855.64 was collected

from Sony for the period ended December 31, 2005.  Exhibit 6.  AREC promised

to send the full amount to them, perhaps because the amount was embarrassingly

low in comparison to the conversations several months earlier that Mr. Mitchell's

recordings were worth millions. Then on February 27, 2006, Mr. Rubin sent Mrs.

Mitchell the "$855.64, which represents the artist royalties received from

Sony/BMG for the period ending December 31, 2005, **at no AREC fee**."  Exhibit

7 (emphasis added).  Apparently in recognition of the small royalty payment, Mr.

Rubin's correspondence reassured Mrs. Mitchell that AREC now has the

"wherewithal to evaluate the reports to determine the discrepancies they contain

with respect to Guy's artist contracts."  *Id*.  Another small royalty check for the

period ending June 30, 2006, was sent to Mrs. Mitchell by Mr. Rubin on August

31, 2006, for $1,299.75, "at no AREC fee." Exhibit 8. For the period ending December 31, 2006, a check in the amount of $3,237.11 was sent to Mrs. Mitchell, "at no AREC fee." Exhibit 10.  For the period ending June 30, 2007, a check in the amount of $2,552.61 was sent to Mrs. Mitchell, "at no AREC fee." Exhibit 11. For the period ending December 31, 2007, a check in the amount of $169.08 was sent to Mrs. Mitchell, "at no AREC fee." Exhibit 13.  For the period ending June 30, 2008, a check in the amount of $4,217.60 was sent to Mrs. Mitchell, "at no AREC fee." Exhibit 14.  Perhaps realizing things were not going to get any better, on February 26, 2009, Mr. Rubin sent Mrs. Mitchell a check in the amount of $2,938.95, which represents the artist royalties received from Sony/BMG for the p[eriod]/e[nding] 12/31/08, less 25% AREC fee." Exhibit 16 ($3,918.60 less $979.65).  This was the first fee ever collected by AREC under the 2005 Agreement of the parties.  The Court finds AREC's collection of this fee to be fully proper under the 2005 Agreement.

In April 2009, Mr. Rubin sent Mrs. Mitchell a check in the amount of $100,000 "for your portion of the $120,000 settlement proceeds, less AREC fee." Exhibit 32.  AREC distributed $100,000 to Mrs. Mitchell and retained $20,000, which it split with the Pelz law firm involved in the Sony suit. According to Mr. Rubin, Mr. Stanzak said his mother always wanted to have $100,000 and because she's going to die, this would be a wonderful gesture.  Mr. Rubin testified that he

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 18

regrettably convinced Pelz to agree to this.  AREC further "agreed to waive any and all expenditures incurred in resolving this matter."  Exhibit 32.  The Court rejects AREC's claims that it deferred its fees for this settlement payment and that it is still owed 50% of the settlement amount.  The Court accepts the express waiver of AREC's letter that the $100,000 represented Mrs. Mitchell's portion, after AREC's fees were deducted.  Further, the Court accepts AREC's express waiver of any and all expenditures incurred in resolving the matter.  Whatever sympathy or subjective motivation Mr. Rubin may have had does not change that all the parties agreed to this settlement. Furthermore, and the Court finds it significant, the settlement with Sony covered a period of time for which AREC had no entitlement to any fees under the 2005 Agreement of the parties.  Exhibit 30 (the Sony settlement covered the period of time from inception of Guy Mitchell recording agreement through June 30, 2008); Exhibit 1 (AREC fees were only to begin for the period ending December 31, 2005).

Inexplicably, on August 21, 2009, Mr. Rubin sent Mrs. Mitchell a check in the amount of "$3,010.34, which represents the artist royalties received from Sony/BMG for the p/e 06/30/09, **less 50% AREC fee**."  Exhibit 17 (emphasis added).  Mr. Rubin testified that in August 2009 he told Mr. Stanzak that "starting from this payment on we're going to start taking back the advances."  He said he was entitled to 25% and he was going to take another 25% toward the advances.

1    Significantly, at trial Mr. Rubin did not testify that Mr. Stanzak or Mrs. Mitchell

2    agreed to any of this.  Nor are there any documents that would reflect an agreement

3    to this process.  Prior to trial, Mr. Rubin filed an affidavit claiming that Mr.

4    Stanzak agreed that AREC could take 50% of the payments "to start making up for

5    the deferral of its fee on the prior royalty payments."  ECF No. 70-1 at ¶ 23.  At

6    trial, Mr. Rubin testified that he explained this procedure to Mr. Pelz, the law firm

7    to which half of AREC's fees were owed, and told him it would take three or four

8    years to completely recoup their fees.  The Trust contends such a lengthy

9    recoupment procedure would also violate the statute of frauds, if it was not in

10   writing.  Mr. Stanzak adamantly testified that he did not agree to any prior

11   deferrals and certainly did not agree to AREC's procedure of taking 50% of future

12   royalty payments.  He testified that he called Mr. Rubin and objected to the 50%

13   deduction from the August 2009 payment.  The November 2009 recorded

14   telephone call confirms a dispute over fees but does not evidence that the parties

15   reached any agreement.

16        The next royalty payment, for the period ending December 31, 2009, was

17   $357.40, all of which was sent to Mrs. Mitchell, "at no AREC fee."  Exhibit 18.  At

18   trial, Mr. Rubin testified that the amount was abysmal so he said, "keep this one."

19   In that transmittal letter, Mr. Rubin justified that no fee was deducted because

20   "royalties received being less than the $6,000 yearly average."  *Id*.  As the Court

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 20

has discussed, while this amount may have been discussed, there never was an objective manifestation of assent as to this amount, and in any event this amount concerned the point at which the 50% rate would apply, not the flat rate of 25%.

According to Mr. Stanzak, because AREC breached the Agreement and improperly took 50% of the royalties from the August 2009 payment and unilaterally inserted the $6,000 figure in the letter dated February 19, 2010, he contacted Sony and requested that all future royalty payments and statements be sent directly to the Trust.  AREC contends the Trust breached the 2005 Agreement by doing so.

The Court finds that AREC expressly waived its right to collect its 25% fee for each of those payments it transmitted to Mrs. Mitchell using the words, "at no AREC fee."  Mr. Rubin candidly testified with respect to the February 19, 2010, payment when he used those same words, "at no AREC fee" that he told the Trust "keep this one."  The Court finds that each time AREC waived its fees, the amount of the royalty payments were "shockingly low," Mr. Rubin's words.  In good conscience, after obtaining the 2005 Agreement with the optimistic projections that Guy Mitchell's recordings could be worth millions, Mr. Rubin waived his fees for those paltry payments.  There was no agreement that AREC's fees would be deferred only to be collected later whenever AREC chose to do so.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 21

The Court therefore finds that AREC wrongfully retained $1,505.17 from the royalty payment for the period ending June 30, 2009. AREC was entitled to its flat rate of 25%, which would have been $1,505.17, but it retained a full 50%, $3,010.34 of the Trust's royalty income. The Court finds, in the context of this Agreement and the importance of every dollar collected by the Trust, that AREC's breach was material. The purpose of the Trust's agreement with AREC was to maximize its royalty payments from Sony; AREC breached that contract by withholding 100% more of the royalty payment than it was entitled to. Such a breach defeats the contract's very purpose. Even though AREC only withheld the additional 25% in one instance, AREC appeared to believe it was entitled to the 50% cut and would have continued to take that percentage had the Trust not contacted Sony and asked that royalty payments be sent directly to the Trust. AREC's breach is material because it deprived the Trust of a significant portion of the royalty payment it expected and irreparably damaged the Trust's faith in AREC. A material breach allows the non-breaching party to rescind the contract, and the Trust did just that by directing Sony to send all future royalty statements and payments directly to the Trust, not AREC. Thus, the Trust's action in response to AREC's breach was not itself a breach of the contract.

///

///

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 22

**D. Conversion**

An injury is remediable in tort if it traces back to the breach of a tort duty arising independently of the terms of the contract. The court determines whether there is an independent tort duty of care, and "'[t]he existence of a duty is a question of law and depends on mixed considerations of logic, common sense, justice, policy, and precedent.'" *Eastwood v. Horse Harbor Foundation, Inc.*, 170 Wash.2d 380, 389 (2010) (quoting *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wash.2d 233, 243 (2001).

Here, the Trust contends AREC's failure to release royalty payments constitutes the tort of conversion.  The payment of royalties, less the legitimate fees AREC earned is the subject of the Trust's breach of contract claim. Since lawful possession of the fees is wholly dependent on the interpretation of the contract, no tort cause of action lies here.  The Trust's conversion claim is dismissed.

**E. Fiduciary Duties**

Every contract carries with it an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of performance. *Frank Coluccio Constr. Co., Inc. v. King County*, 136 Wash.App. 751, 764, 150 P.3d 1147 (2007) (c*iting Badgett v. Sec. State Bank*, 116 Wash.2d 563, 569, 807 P.2d 356 (1991)).  But the duty exists only

"in relation to performance of a specific contract term"; there is no "free-floating" duty of good faith and fair dealing that is unattached to an existing contract. *KeystoneLand Dev. Co. v. Xerox Corp.*, 152 Wash.2d 171,177 (2004) (quotation and citation omitted).

The Trust claims AREC owes additional fiduciary duties based on its specialized knowledge and experience and because it was the Trust's attorney-in-fact. These claims fail. First, according to the Agreement, AREC was the Trust's attorney in fact "but only for the purpose of depositing such funds into your escrow account and upon clearance of such funds you shall then make payment to me, yourself and any third parties (including attorneys) under the terms of this agreement." Exhibit 1. The Trust has failed to prove a breach of any duty with respect to this limited appointment.

Next, the Trust has failed to prove that its relationship with AREC was anything more than an arms' length relationship. As a general rule, participants in a business transaction deal at arm's length and do not enter into a fiduciary relationship. *Liebergesell,* 93 Wash.2d 881, 889 (1980). But special circumstances may establish a quasi-fiduciary relationship in fact where one would not normally arise in law. *Annechino v. Worthy*, 162 Wash.App. 138, 143 (2011), *aff'd,* 175 Wash.2d 630 (2012). "'The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 24

presenting arguments is acting not in his own behalf, but in the interests of the other party.'" *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wash.App. 732, 742 (1997) (quoting *Burwell v. South Carolina Nat'l Bank,* 340 S.E.2d 786, 790 (1986)).  In other words, the plaintiff must show some dependency on his or her part and some undertaking by the defendant to advise, counsel and protect the weaker party.  *Id. See also Liebergesell*, 93 Wash.2d at 891 (lack of business expertise on the part of one party and a friendship between the contracting parties are important elements; superior knowledge and assumption of the role of adviser may contribute to the establishment of a fiduciary relationship).

Here, AREC held no special position for the Trust other than being its collection agent paid on commission.  Mr. Stanzak was the Trust's co-trustee and was a licensed attorney during all the material times relevant to the dispute.  The Trust's relationship with AREC was fraught with conflict, not one where the Trust blithely reposed its trust and confidence to AREC.  The Trust's breach of fiduciary duty claim is dismissed.

**F. Injunction**

The Trust seeks an injunction ordering AREC to join with the Trust in a written direction to Sony that: a) the accrued funds Sony is currently withholding should be paid directly to the Trust; and b) all future royalty payments and the associated royalty statements should be paid directly to the Trust.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 25

"The essential elements which must be shown before an injunction will be granted are necessity and irreparable injury. A party seeking an injunction must show a clear legal or equitable right and a well-grounded fear of immediate invasion of that right. Furthermore, the acts complained of must establish an actual and substantial injury or an affirmative prospect thereof to the complainant." *Agronic Corp. of America v. deBough*, 21 Wash.App. 459, 464 (1978) (citations omitted).

The Court has found a material breach of the 2005 Agreement such that an award of damages has been made and the Agreement has been rescinded. Accordingly, the Trust cannot show the necessity for an injunction and the same is denied.

**G. Declaratory Relief**

The Trust seeks a declaratory judgment that AREC is not entitled to any portion of either (a) the accrued royalties owed to the Trust by Sony under the Mitchell Recording Contract that Sony is currently withholding; or (b) any future royalties owed by Sony to the Trust under the Mitchell Recording Contract. Given the Court's findings and conclusions above, the contract has been rescinded effective August 21, 2009. Thus, the Court denies declaratory relief as moot.

///

///

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 26

**H. Attorney Fees**

The general rule in Washington is that absent a contract, statute, or recognized ground of equity, attorney fees are not available as either costs or damages. *City of Seattle v. McCready*, 131 Wash.2d 266, 275 (1997). There are no contractual, statutory or equitable grounds that would warrant the award of attorney fees in this case.

**I. AREC's Counterclaims for Declaratory Relief, Injunctive Relief and Breach of Contract**

Based on the Court's findings and conclusions above, AREC's counterclaims all fail. AREC's counterclaims for declaratory relief, injunctive relief and breach of contract are hereby dismissed.

///

///

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. The Clerk of Court shall amend the docket to reflect the case was prosecuted for Plaintiff by and through JOSEPH S. STANZAK, as trustee.

2. The Guy Mitchell & Betty J. Mitchell Family Trust's claims and causes of action for conversion, injunction, declaratory judgment, breach of fiduciary duties, and attorney fees are **DISMISSED**.

FINDINGS OF FACTS AND CONCLUSIONS OF LAW
AFTER BENCH TRIAL ~ 27

3.  The Guy Mitchell & Betty J. Mitchell Family Trust's claim and cause of action for breach of contract is **GRANTED**.  The 2005 Agreement between the parties is rescinded and no longer effective.

4.  The Clerk of Court shall enter Judgment against Artists Rights Enforcement Corporation in favor of the Guy Mitchell & Betty J. Mitchell Family Trust in the amount of $2,301.38 ($1,505.17, plus 12% per annum, simple statutory prejudgment interest from August 21, 2009 to today's date), plus costs.  According to 28 U.S.C. § 1961, post judgment interest shall accrue at the rate of 0.13%.

5.  Artists Rights Enforcement Corporation's counterclaim for injunctive relief, declaratory judgment, and damages for breach of contract are **DISMISSED**.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** January 17, 2014.

THOMAS O. RICE
United States District Judge